an treaty fishing rights." *United States v. Washington*, 459 F.Supp. 1020, 1042 (W.D.Wash.1978). The evidence in the ICC report is insufficient to support a broad reading of Dr. Lane's phrase "the beaches of Puget Sound" or Finding 76's phrase "the saltwater of Puget Sound." Even assuming fishing did take place, there is nothing in the ICC finding to indicate that it met the requirements of "usual and accustomed."

**UNITED STATES of America; Suquamish Indian Tribe; Lower Elwha Band of Klallams, Lower Elwha Band of S'Klallams; Jamestown Band of Klallams, Jamestown Band of S'Klallams; Port Gamble Band of Klallams, Port Gamble Band of S'Klallams; Skokomish Indian Tribe; Puyallup Tribe; Makah Indian Tribe; Tulalip Tribe; Muckleshoot Indian Tribe; Nisqually Indian Tribe; Swinomish Indian Tribal Community; Hoh Indian Tribe; Nooksack Indian Tribe; Quileute Indian Tribe; Upper Skagit Tribe, et al., Plaintiffs,**

**and**

**Quinault Indian Nation; Chehalis Indian Reservation; Shoalwater Bay Indian Tribe, Plaintiffs–Appellees,**

**v.**

**State of WASHINGTON, Defendant–Appellant,**

**and**

**Coast Oyster Company, Defendant.**

**No. 99–35104.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 2000

Filed Dec. 13, 2000

As Amended on Denial of Rehearing Feb. 3, 2001.

Richard Reich (argued), Office of the Reservation Attorney, Quinault Indian Na-tion, Tahola, Washington, for plaintiffs-appellees Quinault Tribe.

Harold Chesnin (argued), Mathews Garlington–Mathews & Chesnin, Seattle, Washington, for plaintiffs-appellees Chehalis Tribe.

Jay D. Geck (argued) and Robert K. Costello, Washington State Attorney General's Office, Olympia, Washington, for the defendant-appellant.

Before: SCHROEDER, BEEZER, and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

This case is a tributary, flowing out of the watershed fishing rights case of *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974) ("the Boldt Decision"), *aff'd*, 520 F.2d 676 (9th Cir.1975). The Boldt Decision sought to divide equitably salmon fishing rights between the State of Washington and various Native American tribes, whose fishing rights are secured by treaty with the United States. Here, the district court dealt with the fishing rights held by the Confederated Tribes of the Chehalis Reservation ("the Chehalis"), whose reservation was created by Executive Order. The district court reasoned that the rationale underlying Judge Boldt's decisions—that the off-reservation catch of a non-treaty tribe should be attributed to (i.e., come out of the share of) the State—should apply to the on-reservation catch of a tribe whose reservation was created not by treaty but by Executive Order. We agree with the district court's interpretation of Judge Boldt's decisions and affirm.

## I. Facts & Procedural Background

The Chehalis River in western Washington is one of the largest rivers in the Grays

Harbor watershed. It produces native and hatchery salmon runs, including coho, chum, fall chinook, spring chinook, and steelhead. These fish were an important source of livelihood to many tribes living in the area in the middle of the nineteenth century.

In 1859, the United States ratified the Treaty of Olympia (also known as the Treaty with the Quinault) with the Hoh, Quileute, and Quinault tribes. Under Article Three of this treaty, the tribes were guaranteed "the right of taking fish at all usual and accustomed grounds and .stations ... in common with all citizens of the Territory." 2 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 719 (1904). The treaty created a reservation for the Quinaults on the Pacific coast. At treaty time, Grays Harbor and the streams that empty into it were part of the Quinault's usual and accustomed fishing grounds. *See Washington,* 384 F.Supp. at 375. The Chehalis chose not to sign the Treaty of Olympia, but an 1864 order of the Secretary of the Interior created a reservation for the Chehalis on the Chehalis River, approximately 43 miles upstream from where the river enters Grays Harbor.

The Boldt decision required equitable allocation of fishing rights between the treaty tribes and the State of Washington. As the Supreme Court later affirmed in *Washington v. Washington State·Comm. Passenger Fishing Vessel Ass'n ("Fishing Vessel")*, 443 U.S. 658, 684–85, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), "[b]oth sides have a right, secured by treaty, to take·a fair share of the available fish."

In 1983, Washington, pursuant to the district court's continuing jurisdiction in the fishing cases, sought a request for determination regarding how to count the fish caught by the Chehalis Tribe. The State contended that these fish should count as part of the treaty share, since they were caught pursuant to federally secured fishing rights. Appellee Quinault Indian Nation countered that the Chehalis fish should be counted as part of the State's share, because the Chehalis were never a party to any treaty.

The State filed a motion for partial summary judgment in 1987, but the district court deferred ruling until a separate determination of Chehalis off-reservation fishing rights had been completed. We resolved that issue in 1996, concluding that the Chehalis were not entitled to off-reservation fishing rights. *Confederated Tribes of Chehalis Indian Reservation v. Washington,* 96 F.3d 334 (9th Cir.1996).

On December 2, 1998, the district court issued an unpublished decision granting summary judgment to the Quinault. The district court relied in part on Judge Boldt's 1974 order, which enjoined the State from treating any off-reservation taking of fish as treaty fishing unless the court had determined that such taking was by a treaty tribe. The district court in this case found it only logical to extend Judge Boldt's order to on-reservation non-treaty Indians, reasoning that the equitable allocation of fish is inextricably linked to the treaties between the United States and certain tribes. Because the Chehalis were not fishing pursuant to treaty rights, the district court determined that it was not appropriate to attribute their share of fish to the treaty tribes and concluded that the Chehalis fish should therefore be deducted from the State's share. The State of Washington appeals from this decision.

## II. Analysis

■ · This dispute hinges on a peculiar problem, unforeseen in the early stages of the treaty fishing litigation. The Chehalis Reservation is one of only a few in the State of Washington that is not derived from a treaty with the United States. Thus, the Chehalis Tribe was not a party to the Boldt Decision, which rested on the interpretation of Indian fishing rights under the tribes' treaties with the United States. We must determine, applying a de novo standard of review, whether the fish harvested by the Chehalis on their own

reservation should be allocated to the State or to the treaty tribes.

### A. Prior Decisions in the Fishing Cases

As this dispute arises from the Boldt Decision, we turn to the settled law in this case for guidance. We believe that the prior cases establish that fish are to be divided equitably between treaty tribes and other parties. We have never held, as the State now urges, that the relevant distinction is between tribal and non-tribal interests.

■ In 1974, Judge Boldt issued an order stating in relevant part:

> The defendants shall not, with respect to any Indian tribe or group which has not specifically been determined by this court to be entitled on an interim or permanent basis to be recognized as a treaty tribe, treat any off-reservation taking of fish from stocks of the case area by such tribe or group as treaty fishing in making any allocation of fish to treaty Indians or in restricting the fishing of tribes recognized by this court as treaty tribes pursuant to the decree and orders in this case, without first obtaining the concurrence of the tribes involved.

*United States v. Washington*, 459 F.Supp. 1020, 1037 (W.D.Wash.1978). Because this order was not appealed, it remains the law of the case. *See Coleman v. Calderon*, 210 F.3d 1047, 1052 (9th Cir.2000). Although Judge Boldt's order does not specifically address the issue of on-reservation fishing by non-treaty tribes, it does establish the principle that no catch by non-treaty Indians should be attributed to the treaty tribes.

We embraced this proposition in *United States v. Washington*, 520 F.2d 676, 682 (9th Cir.1975). In that case, we held that the phrase "other citizens," as used in the treaty cases, includes a "substantial number of citizens of Indian ancestry who are no longer enrolled members of treaty tribes." *Id.* at 682 n. 1. This reasoning is consistent with the idea that treaty tribes differ in kind from non-treaty tribes for purposes of the treaty fishing litigation.

We reaffirmed the special character of the treaty tribes in *Confederated Tribes of the Chehalis Indian Reservation v. Washington*, 96 F.3d 334 (9th Cir.1996). In that case, we rejected the Chehalis Tribe's claim to off-reservation fishing rights, reasoning that as a non-party the Chehalis were not entitled to any fishing rights under the Treaty of Olympia. *Id.* at 340.

These principles control the present dispute. Each case focused on the distinctive nature of fishing rights secured by treaty. We agree with the district court that "[t]he equitable allocation of fisheries simply cannot be divorced from its source: the treaties between the United States and certain Indian tribes." The Chehalis Tribe was never party to a treaty; accordingly, the fish taken by the Chehalis cannot be attributed to the treaty tribes.

### B. Treaty Interpretation

This result is consistent with more general principles of federal law regarding tribes and treaty interpretation. As the State correctly notes, *Fishing Vessel* establishes equitable allocation of fish with a maximum of 50% to the treaty tribes. It does not guarantee 50% to the tribes. We do not believe, as the State contends, that the district court misunderstood this issue.

What the district court implicitly recognized was that the addition of a non-treaty tribe to the treaty share effectively diminishes the treaty rights secured to the treaty tribes. Quite simply, if one tribe is granted a right to an equitable distribution of fish, subject to a 50% maximum, that right is diminished when it must be shared with another tribe. Under the first scenario, one tribe has the possibility, though not the certainty, of securing a 50% share. Under the second scenario, barring the complete extermination of the second tribe, the first tribe will never have the chance of securing a 50% share. In this case, including the Chehalis catch as part

of the treaty tribes' allocation, would diminish the value of those treaty rights, which were secured prior to the creation of the Chehalis reservation.

■ It is a time-honored principle that ambiguities in agreements and treaties with Native Americans are to be resolved from the native standpoint. *Winters v. United States*, 207 U.S. 564, 576, 28 S.Ct. 207, 52 L.Ed. 340 (1908). We have previously held that this canon of construction extends to executive orders, and "any doubtful expression in them should be resolved in the Indians' favor." *Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir.1995) (quoting *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970)). Here, the State in effect urges us to conclude that the 1864 secretarial order diminished the rights of the treaty tribes.[1] We reject that crabbed interpretation. We doubt that treaty rights, ratified by the United States Congress, can be so readily altered by mere orders of the Secretary of the Interior. The better approach is that of the district court, whose interpretation, consistent with the canons of construction, construes the treaties and the 1864 order in favor of federally secured Indian rights.

### C. The State's Arguments

None of the cases relied on by the State compels a different result. The State places great emphasis on *Parravano*, 70 F.3d at 539. *Parravano* concerned the authority of the Secretary of Commerce under the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.*, to reduce the harvest of non-Indian fishers in order to protect the on-reservation fisheries of two Indian tribes. The Magnuson Act directed the Secretary to consider "any applicable law" in making his determinations. We held that the phrase "any applicable law" included both treaties and executive orders creating In-

dian reservations. *Parravano*, 70 F.3d at 547.

*Parravano* stands for the simple proposition that, for the purpose of protecting *on-reservation* fishing rights, there is no difference between tribes whose reservations were created by treaty, and tribes whose reservations were created by executive order. That is not at issue here. We are concerned with whether the on-reservation catch of an executive order tribe should be counted as part of the catch of a treaty tribe fishing in the same area.

The State further contends that the Supreme Court decision in *Fishing Vessel* stands for the proposition that fish are to be equitably divided between tribal and state shares. However, *Fishing Vessel* explicitly divides fish between "treaty and non-treaty shares," 443 U.S. at 685, 99 S.Ct. 3055, not between tribal and state shares. Nothing in *Fishing Vessel* supports the distinction the State now advances, nor is there anything in that decision that relates to the issue of accounting for on-reservation harvest by a non-treaty tribe.

### CONCLUSION

The district court properly granted summary judgment in favor of the Quinault Nation. The Chehalis were never a party to any of the treaties underlying this litigation; consequently, they cannot be considered a treaty tribe for the purposes of equitable allocation of salmon under those treaties. This conclusion is consistent with Judge Boldt's initial decisions in this case and with general principles of federal Indian law.

AFFIRMED.

---

1. The Chehalis Tribe would appear to have no direct interest in this matter, since the issue

concerns how to count its catch, not the size of that catch.